Charles **MILTON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 64268.

Court of Criminal Appeals of Texas, En Banc.

June 11, 1980.

Rehearing Denied July 2, 1980.

Frank W. Sullivan, III, Fort Worth, for appellant.

Tim Curry, Dist. Atty., William D. Kane, Jr., David B. Lobingier, Dale S. Hanna and C. Chris Marshall, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for capital murder. The jury assessed punishment at death.

 Milton argues that the trial court impermissibly limited his voir dire of the jury panel by refusing to permit defense counsel to inquire as to the veniremen's definitions of "deliberately", "probability", and "criminal acts of violence." In *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App. 1978), we held that "[v]oir dire examination could take an unreasonable length of time if attorneys on both sides selected different words throughout a contemplated charge and asked each prospective juror what those words meant." The limiting of voir dire is within the trial court's discretion and we find no abuse of that discretion here. See *Esquivel v. State*, 595 S.W.2d 516 (1980); *Battie v. State*, 551 S.W.2d 401 (Tex.Cr.App. 1977).

 Milton also challenges the sufficiency of the evidence at the punishment phase to support the jury's answers to special issues numbers one and two as required by Article 37.071(b), V.A.C.C.P. As to the issue of whether Milton's conduct "that caused the death of the deceased was committed deliberately," the evidence shows that Milton entered a liquor store in Fort Worth that was owned by Leonard and Menaree Denton. Milton pointed a gun at Mrs. Denton and ordered her to give him the money in the cash register. He then ordered the Dentons to the store's back room. Mr. Denton grabbed the barrel of Milton's pistol and started struggling for the gun. According to Denton, Milton kept trying to point the gun again and again at Mrs. Denton. Mrs. Denton broke two wine bottles over Milton's head but the fight continued. The gun went off, killing Mrs. Denton. Denton then yelled, "Why don't you leave? Haven't you done enough? You've killed my wife." Denton testified that Milton replied, "Hell no, I haven't killed her yet, but she is going to die."

On cross-examination, the following exchange occurred:

"Q. All right, and you yourself, Mr. Denton, being honest—you can't tell this jury that this gun didn't go off by accident while you two were struggling, can you?

"A. By accident, no, sir. I can't say that the man didn't pull the trigger. He pulled the trigger this—he was steady, pulling the gun down on my wife each time I would push it away from him. This is what he was trying to do.

"Q. He was—he was steady pulling the gun, but you were steady pulling the gun, too?

"A. I was steady pushing the gun away from him, sir.

"Q. Pushing this way and that way (attorney indicating)?

"A. Yes, sir.

"Q. And you can't tell this jury that this gun wasn't discharged by accident, can you, sir?

"A. I can't say that it wasn't discharged by intentional.

"Q. Mr. Denton, please, sir.

The question is: can you tell this—you can't tell this jury that this gun wasn't discharged by accident, can you, sir?

"A. I don't see why it would be, sir."

In *Smith v. State*, 540 S.W.2d 693 (Tex. Cr.App. 1976), we found the conduct there to have been committed deliberately when there was no evidence that the defendant was under the domination of anyone, nor was he under any mental or emotional pressure. Though Milton argues that the evidence shows an accidental discharge of the pistol, we disagree. Taken in the light most favorable to the verdict, the evidence demonstrates that Milton continually kept attempting to point the gun at Mrs. Denton but was prevented from doing so by Mr. Denton until the fatal discharge. From the evidence of Milton's conduct, one must conclude that Milton "could reasonably expect that death would result" from his conduct.

*Granviel v. State*, 552 S.W.2d 107 (Tex.Cr. App. 1976).

As to the issue of whether there was a probability that Milton would commit future acts of criminal violence, Article 37.- 071(b)(2), V.A.C.C.P., the evidence shows that on each of the two days prior to the Denton murder Milton committed an armed robbery. Each victim testified that Milton came in to their respective stores under the pretext of doing business with them. Milton then pulled a gun and demanded all the money. He then ordered the victims to a back room, locked them in and ordered them not to either get out or cry out for help for a period of time or he would kill them. This was the same method used in the Denton robbery. Further, a "pen packet" was introduced showing Milton's 1972 conviction for theft over fifty dollars. Finally, evidence was adduced that Milton was seen driving around Fort Worth with a .32 caliber pistol in his car, a different pistol than the one used in the various robberies. Testimony at the guilt phase of the trial showed that Milton, before the armed robberies were committed, kept trying to secure a pistol and finally borrowed the one used in the robberies and the Denton murder from a friend.

In *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App. 1979), we set forth a number of the elements that, when supported by the evidence, will sustain an affirmative answer to special issue number two. Article 37.071(b)(2), supra; 591 S.W.2d at 480– 81. These elements include the circumstances of the capital offense, the calculated nature of the defendant's acts and the forethought and deliberateness exhibited by the crime's execution. The existence of a prior criminal record is probative and relevant evidence. Here, the evidence showed that Milton used the same method in each of the three armed robberies he committed. All involved a threat to kill the victim. In the Denton robbery, the evidence showed that Milton on six or seven occasions pointed a pistol at Mrs. Denton with the intent to kill her, only to be prevented from doing so by her husband's intercession. There is more than sufficient evidence for the jury to conclude that Milton constituted a continuing threat to society.

Milton also argues that the trial court committed reversible error when it admitted evidence of the two prior armed robberies. He claims that these amounted to unadjudicated extraneous offenses for which he received no notice. As to the lack of notice, there is nothing in Article 37.071, supra, that requires notice to the defendant before extraneous offenses can be introduced. In the case at bar, the prosecutor, in open court, announced that he had let defense counsel examine everything in his file concerning Milton's case. Further, defense counsel filed a motion in limine seeking to prevent the State from making any reference to extraneous offenses. We find that, under these circumstances, defense counsel was given ample notice of the offenses, even though none was required.

As to the use of the unadjudicated offenses, the Supreme Court of the United States, in *Jurek v. Texas,*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), stated that the principle focus of Article 37.071(c), V.A.C.C.P., was that all relevant evidence concerning the defendant must be placed before the jury. In *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App. 1979), we held that this included the use of unadjudicated offenses at the punishment phase. There is nothing in Article 37.071, supra that limits the evidence to final convictions. See *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App. 1979). This contention is overruled.

In his last two grounds of error, Milton complains of the admission into evidence of two photographs, one of the victim after she had been shot and the other of the victim and Mr. Denton standing together. In *Martin v. State*, 475 S.W.2d 265 (Tex.Cr. App. 1976), we held that if a verbal description of the scene was admissible, so was a photograph. The complained of photographs were not so gruesome and inflammatory as to outweigh their probative value. This contention is overruled.

The judgment is affirmed.

ROBERTS, J., concurs in the result.

828

CLINTON, Judge, dissenting.

On the matter of ascertaining a venireman's understanding of "deliberately" I would be content merely to note my dissent for reasons stated in my opinion dissenting in *Esquivel v. State*, 595 S.W.2d 516 (Tex. Cr.App. 1980) had not the Supreme Court of the United States once again revisited the Georgia capital murder statutes. As a caution I invite attention to the following synopsis of constitutional rationale as set forth in the plurality opinion of *Godfrey v. Georgia*, —— U.S. ——, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980):

> "This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' *Gregg v. Georgia*, supra, 428 U.S. [153] at 196, n. 47 [96 S.Ct. 2909 at 2936, n. 47, 49 L.Ed.2d 859]. See also *Proffitt v. Florida*, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913]; *Jurek v. Texas*, 428 U.S. 262 [96 S.Ct. 2950, 49 L.Ed.2d 929]. It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' As was made clear in Gregg, a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman could occur'. 428 U.S., at 195, n. 46 [96 S.Ct. at 2935, n. 46]." [Footnotes omitted]

I dissent.

PHILLIPS, J., joins in this dissent.